## FLECKINGER v. TAFFEE.

1. MALICIOUS PROSECUTION—EVIDENCE—ADMISSIBILITY.
    In an action for malicious prosecution, evidence as to the family of plaintiff is admissible.

2. SAME—EVIDENCE—APPEARANCE OF DEFENDANT.
    It is error to allow a witness to state that defendant appeared to be displeased because plaintiff was allowed to go on his own recognizance, since such testimony goes beyond giving the appearance of the defendant as evidencing a mental state of pleasure, ill will, anger, or the like, which is permissible.

3. SAME—PROBABLE CAUSE—QUESTION OF LAW OR FACT.
    Where the facts are undisputed the question of probable cause is for the court.

4. SAME—DEFENSES—ADVICE OF COUNSEL.
The advice of counsel, followed in good faith, after a full and fair statement of all the material facts in the case, is a defense to an action for malicious prosecution, though the facts as stated to counsel do not justify the advice given.

Error to Calhoun; North, J. Submitted June 19, 1907. (Docket No. 73.) Decided October 4, 1907.

Case by George C. Fleckinger against Thomas Taffee for malicious prosecution. There was judgment for plaintiff, and defendant brings error. Reversed.

*Hatch & Page* (*E. J. Dennison*, of counsel), for appellant.

*H. W. Cavanagh*, for appellee.

BLAIR, J. Defendant caused the arrest of plaintiff for the alleged larceny of a quantity of corn from the farm of defendant, which, at the time of the alleged larceny, was occupied and operated by plaintiff under a written lease containing, among other provisions, the following: Said Fleckinger, party of the second part,—

" To cultivate, work, harvest crops, plant, sow, reap, gather fruit and do each and everything proper and necessary in a good husbandlike manner, and deliver in market all stock, grain and hay, when sold from said farm, under the direction and supervision of the party of the first part, as tenant working the farm of the party of the first part, situated and being in the township of Clarendon, on sections four and five. Said party of the first part to be the directing and controlling mind in the manner in which all work upon said farm shall be performed, and as to the manner of seeding, cultivating and gathering the sale of crops, stock and each and everything pertaining to the management of said farm, said second party taking and being in the position of a servant working and cultivating said farm.  *  *  *
" The said party of the second part agrees to harvest and gather said crops in proper season and to market the same under the direction of the said party of the first part,

and the proceeds of the same shall be delivered to the said party of the first part upon demand, after deducting the share of the party of the second part. The party of the second part shall be entitled as his compensation for working said farm, one-half of the products of said farm, but it is expressly agreed and understood that all the products grown upon said farm shall first be used to feed and keep in proper condition the stock, hogs, sheep and poultry upon said farm, including six work horses used upon said farm, and two horses and one cow, property of the party of the first part, being in the city of Marshall, and said party of the first part shall have the right to take from the products of said farm sufficient material grown on said farm, to feed, bed and keep said two horses and cow in a proper condition. * * *

" The increase of the stock of said farm shall be divided equally, the products of the said farm shall be divided equally, after feeding as above stated. The fruit grown upon the said farm shall be divided equally. The said second party shall have one-quarter of an acre for a garden of his own. * * *

" The term products of said farm is understood to mean everything produced or grown upon said farm (except garden spot) from a hen's egg to a load of wheat, in fact, everything of every nature and name that is either grown, sown, harvested or raised on said farm.

"It is hereby agreed and understood that the right, title and interest of and to every piece and particle of personal property upon said farm, and the farm itself, is and are absolutely in the party of the first part, who shall have at any time, when the said party of the second part shall fail to perform the conditions of said lease in any manner, the right to take possession of the same and sell the same at public or private sale, and to retain the proceeds of the same as stipulated damages for the nonperformance of this contract. But in case the party of the second part shall well and faithfully perform the conditions of this contract, then the said party of the second part shall be vested with the absolute title to one-half of the products and stock of said farm on the 13th day of March, 1906. The said party of the first part does hereby constitute and make the said party of the second part his agent and attorney in fact, to sell and receipt for products grown and sold from said farm, and the said second party does hereby accept said agency."

Plaintiff was discharged upon the examination and brought this suit to recover damages for alleged malicious prosecution.    Plaintiff took possession of the farm, under the lease, March 14, 1905, and moved off February 20, 1906.   On December 21st, defendant notified plaintiff not to move any of the corn off the farm.   On December 27th, plaintiff drew 45 bushels of the undivided corn away and sold it, upon advice of counsel but without defendant's knowledge.   On December 21st, plaintiff asked defendant to divide the corn, which he refused to do.

"December 21st was our first settlement of the book account.    *   *   *

"I had a settlement with Mr. Taffee after the 21st of December, on the 27th of December, 1905, when we settled right.   The first settlement was no good, we didn't settle right.   That is the time he brought up two witnesses and I asked him if they were witnesses and he said no, and both boys said they wasn't, but it seems they was. We settled up what he owed me and then deducted what I owed him after what I had credited and balanced the account, and he had $85.71 coming to him and I had a credit of $65.54.   I fell in debt to Mr. Taffee $20.17, which I paid February 6th, 1906.   I rented another farm that spring, where I am now living.   My wife notified Mr. Taffee that I had.

" *Q.* What did you proceed to do in regard to the corn on Mr. Taffee's farm.

"*A.* Well, on the 21st of December, in the first place, I asked Mr. Taffee to divide up all the corn so that I could do with my share what I pleased and he could do with his share what he pleased, and he said that there wasn't a damn ear of corn in that crib belonging to me on the 21st of December.   I went and saw you and you advised me to haul my share.    *   *   *

"After that I took three loads of 180 bushels over to the farm; I measured it all up when I put it in, and there was 390 bushels.   At that time I had on the farm three head of cows and four head of young cattle; Mr. Taffee had equally as many as I did and we had raised a few more besides.   They were to be fed upon the place.   My lease was not to be out until the first of March, 1906.   I took away the 180 bushels of corn on the 25th of January, 1906. I had no talk with Mr. Taffee about dividing up after De-

cember 21st, 1905, until after my arrest; then they decided to let the two attorneys divide it up; all the goods.

"*Q.* After the 21st of December, 1905, up to the time of your arrest, you did not ask him to divide up the corn or any of the crops on the place?

"*A.* No.  *  *  *  After my arrest and discharge I and Mr. Taffee had a settlement; we divided up the corn that was left there.  *  *  *

"*Q.* Of the corn that you hauled over to the other place, you did not haul your half by 25 bushels; is that right?

"*A.* That is right."

The defendant, Taffee, swore to the criminal complaint January 27, 1906. Before making the complaint, he testified that he consulted with Mr. Dennison, an attorney at law, who drew the lease in question and who had been his attorney for a year before that:

"Before making the complaint I advised with Mr. Dennison at his office; I told him there had been at least one load of corn moved at this time; I also told him the circumstances, as I had learned them that day, about the corn being gone, the forty-five bushels; Mr. Dennison told me that it was larceny and I had a case against the man, but I said that I would proceed to drop that if he would stop there, as I told him that day in the presence of his neighbor who drew the corn away, that he must not or they must not move any more corn from my farm; later when I began to miss corn again I went to Mr. Dennison again. 'This must be stopped,' I said; he said, 'That is the way to stop it, it is larceny, take him with a warrant for larceny.' Mr. Dennison advised me the day that the complaint was made that it was larceny; he said that that was the way to stop it, the proper way, and the only course that I had; that it was larceny and that I must stop it that way; I talked with Mr. Dennison about the corn; I told him again about the forty-five bushels that was sold on the 27th of December, 1905, and after that, the next three or four weeks, I couldn't give the date exactly, I found several loads more gone from the crib; that is, the crib had that appearance, and I went to Mr. Dennison again and that was his advice and I acted on it.

"*Q.* Would you have made that complaint without the advice of Mr. Dennison?

"*A.* No, sir, I would not, I don't think; I don't pretend to know anything about the law. I paid Mr. Dennison for the counsel I had on that occasion. It is true that I forbade plaintiff taking any corn out of the crib on the 21st of December, 1905; I again forbade him on the 27th day of December, 1905. I had my lease when I had a talk with Mr. Dennison and he gave me advice, and Mr. Dennison looked over the lease; I don't think that I made complaint about anything but the corn, and I told him it looked as though about half of the crib was moved —800 bushels; I told Mr. Dennison of my forbidding plaintiff to take away the corn; on the 21st of December, 1905, I claimed to plaintiff that all the corn in the crib was mine. I had the perfect right and control of it under the expressions in this lease. If his duty was fulfilled, one-half of that corn was his, but at that time it was all mine.

"I don't know whether I have told here all I said to Mr. Dennison but as near as I could remember everything that bears upon the point. I cannot say that I told him something else, I do not remember. I told him that this man was indebted to me nearly $400 or that I was obligated to that amount with him. I don't think that I swore to Mr. Fleckinger, I said that the corn was mine, and that he had no right to move any of it off from the place, and according to our lease he must not do it. I dispute the testimony of plaintiff so far as the language goes. I told Mr. Dennison about Mr. Fleckinger taking away the 45 bushels of corn, some time after the 27th of December, and he advised me then to take this man for it, but I thought it was so small in amount that I would let it go if he did not take any more.

" *Q.* Did you tell him that you balanced accounts that day?

"*A.* No, I didn't tell him anything of the kind. I might have balanced a running account that he was owing me, but the stock, or anything of that kind, wasn't settled, and I didn't tell him it was.

" *Q.* Did you tell him anything about it?

"*A.* I don't remember that I did. I might have, though."

The magistrate testified:

" *Q.* When Mr. Dennison came in there with Mr. Taffee on the first occasion of making the complaint before

the warrant was issued, you understood that he was counsel for Mr. Taffee, did you not?

"*A.* Why, he told me that he had been over there and looked this all up, and I relied upon it as evidence in the case as to the condition of affairs, partially, at least, with Mr. Taffee in the case.

"*Q.* Didn't you understand that he was representing Mr. Taffee?

"*A.* I thought so at the time, yes.

"*Q.* And didn't he advise Mr. Taffee that he could make the complaint?

"*A.* He told me that it was a valid case in the presence of Mr. Taffee.

"*Q.* On the first occasion?

"*A.* On the first occasion.

"*Q.* And it was on the strength of what he told you, or partially, that you issued the warrant?

"*A.* Yes, partially."

At the close of plaintiff's case, defendant's counsel made the following motion:

"*Mr. Hatch:* At this time we move the court to direct a verdict in favor of the defendant for the following reasons:

"1. For the reason that the act of the plaintiff in this case, Mr. Fleckinger, under his evidence and under the contract or the lease of the farm, was larceny, the act of the taking of the corn and moving it away after he had been directed by Mr. Taffee not to move it, it was, under the evidence in this case, larceny.

"2. That it appears from the evidence, on the part of the plaintiff, that what defendant did in making the complaint, and the consequent arrest of plaintiff in this case, was done under and by reason of the advice of counsel, Edward J. Dennison, an attorney at law, and that that would constitute a perfect defense in the making of the complaint, and a perfect defense in this case.

"3. That there is no evidence of malice in the making of the complaint, and that there was probable cause in the making of the complaint."

The motion was overruled and exception taken. At the close of the case, defendant's counsel renewed the motion with like result. The court submitted the case to the

jury, who found for plaintiff, assessing his damages at $906.28. Defendant's counsel also made a motion for a new trial, the denial of which and the reasons therefor were excepted to and incorporated in the bill of exceptions for review. Among the points argued in the brief for the defendant are the following:

"The court erred in overruling the objection made by the defendant to the question, 'How much of a family has Mr. Fleckinger,' and in again permitting such testimony against the objection of defendant and in refusing to strike it out.

"The court erred in permitting one of the plaintiff's witnesses to answer the following question, 'State whether or not Mr. Taffee was pleased or not because Mr. Fleckinger was allowed to go on his own recognizance.'

"The court erred in refusing to direct a verdict for defendant upon the evidence of plaintiff, after plaintiff had rested his case."

The court did not err in permitting proof as to the family of plaintiff. *Davis* v. *Seeley*, 51 Am. St. Rep. 357 (91 Iowa, 583); *Smith* v. *Hubbell*, 142 Mich. 637.

We think it was error to permit an answer to the question, "whether or not Mr. Taffee was pleased," etc. The question was asked of a witness who testified to a conversation with Taffee after the adjournment of the criminal case.

"I asked him what they had done and he told me that they held it open until Cavanagh got there. He made some further remark about it, but I am not clear as to what he said. I could not swear positively as to what he said. * * * The substance of it was that he was going up to Mr. Deuel's and see the reason that he let him go.

"*Q.* State whether or not Mr. Taffee was pleased or not because Mr. Fleckinger was allowed to go on his own recognizance?

"*Mr. Hatch:* I object to that as calling for a conclusion.

"*The Court:* I think that is the only way he can convey the idea to the jury.

"*Mr. Hatch:* Exception.

"*A.* From his appearance I should say that he was not."

This testimony went beyond giving the appearance of the defendant as evidencing a mental state of pleasure, ill will, anger, or the like, which is permissible. *People* v. *Lilly*, 38 Mich. 270; 17 Cyc. pp.91, 150; *Thurston* v. *Wright*, 77 Mich. 96. The error in the ruling is that it permitted the witness to state his conclusion as to the reason for the appearance, viz., that he appeared to be displeased "because Mr. Fleckinger was allowed to go on his own recognizance."

We are also of the opinion that the court erred in denying defendant's motion for an instructed verdict. Where the facts are undisputed, the question of probable cause is for the court. *Rogers* v. *Olds*, 117 Mich. 370. The material facts were undisputed in this case, were fully and fairly stated to counsel, and the complaint made in reliance on his advice. The material facts were, that plaintiff, against the warning of defendant and without his knowledge or consent, removed the corn and converted it to his own use. Under the provisions of the lease, the plaintiff was clearly guilty of an unlawful conversion of the corn, which would have supported a civil action against which he could have made no defense. If plaintiff took the corn with felonious intent, he was guilty of larceny, otherwise not. There was no dispute as to what plaintiff did; he admitted taking the corn, substantially as stated by defendant, and justified his taking by the advice of counsel. The only dispute in the case is as to the effect of what plaintiff did. His counsel advised him, erroneously, as we think, that he had a right to take the corn. Defendant's counsel advised him, also erroneously, in our opinion, that, as a matter of law, the acts of plaintiff constituted larceny. The settlement of the book account had no bearing upon the question, and it was immaterial whether defendant stated it to his counsel or not. The defendant

was protected by the advice of counsel, and the motion should have been granted. *Poupard* v. *Dumas*, 105 Mich. 326.

Judgment reversed, and new trial granted.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.